**In re Christopher CRUDUP D/B/A 2 Wheel Performance, Debtor.**

No. 02–05118–8–ATS.

United States Bankruptcy Court, E.D. North Carolina, Wilson Division.

Dec. 20, 2002.

Stephen G. Inman, Murray, Craven & Inman, L.L.P., Fayetteville, NC, for debtor.

William P. Janvier, Everett, Gaskins, Hancock & Stevens, Raleigh, NC, for Shannon Donovan.

## ORDER REGARDING MOTIONS FOR SANCTIONS AND MOTION FOR PROTECTIVE ORDER

A. THOMAS SMALL, Bankruptcy Judge.

The matters before the court are the debtor's motions for sanctions and for a protective order and the motion of Shannon Donovan to compel and for sanctions. A hearing took place in Raleigh, North Carolina on December 3, 2002.

Christopher Crudup d/b/a 2 Wheel Performance filed a petition for relief under chapter 13 of the Bankruptcy Code on June 20, 2002. Mr. Donovan, who holds a judgment against Mr. Crudup, obtained an order dated October 11, 2002, allowing him to conduct a Rule 2004 examination of Mr. Crudup and requiring the debtor to produce documents prior to the examination. The 2004 exam was to be conducted on October 22; however, it was rescheduled when the debtor failed to provide any documents to Mr. Donovan's attorney. As of the hearing on December 3, 2002, only a few documents had been produced, and Mr. Donovan filed a motion to compel production of documents and for sanctions for failure to comply with the order of October 11, 2002. At the hearing, Mr. Crudup admitted that additional documents needed to be produced, and the motion to compel was resolved by Mr. Crudup's concession, subject to Mr. Crudup's motion for protective order.

Some time after the motion to conduct the 2004 exam was filed, Mr. Donovan sent an undated letter to Mr. Crudup's wife and her parents that details Mr. Crudup's history with Mr. Donovan and others, and threatens that Mr. Donovan will "blanket Fayetteville with this information." The letter also contains information on how Mr. Crudup's problems with Mr. Donovan could be resolved. As a result of this letter, Mr. Crudup filed a motion for protective order seeking to avoid providing documents to Mr. Donovan for fear that he would contact suppliers, third parties, and other family members with the information contained in the documents. In the alternative, Mr. Crudup asked that Mr. Donovan be limited to using the documents only within the bankruptcy proceeding. Mr. Crudup also filed a motion for sanctions, contending that the letter to Mrs. Crudup and her parents violated the automatic stay.

Part of Mr. Crudup's business is to sell motorcycles on consignment. Mr. Donovan contends that he placed a motorcycle with Mr. Crudup to sell on consignment in 1998 or 1999, and Mr. Crudup sold the motorcycle but failed to pay Mr. Donovan the price he received for the sale. Mr. Crudup gave Mr. Donovan numerous excuses for why he had not turned over the funds, including problems with the IRS and other paperwork. According to Mr. Donovan, Mr. Crudup has stolen funds from numerous other customers, either by selling motorcycles without paying the owners for the bikes or by not paying off liens on the motorcycles. Mr. Donovan tried to have Mr. Crudup prosecuted criminally, but the charges were dismissed. Mr. Donovan obtained a judgment against Mr. Crudup in Georgia, which has been recorded in North Carolina.

Mr. Donovan has taken it upon himself to protect others from Mr. Crudup's "scam." Mr. Donovan contacted numerous other people who claim to have been defrauded by Mr. Crudup, and he assisted others in pursuing legal claims against Mr. Crudup, both civilly and criminally. Mr. Donovan's letter to Mrs. Crudup describes the scheme that he contends Mr. Crudup operates, and it explains how Mr. Donovan "helps" other "victims." He admits that he has contacted publications to prevent them from running ads for Mr. Crudup's business, and that he "will inform the cycle community and public in NC of your shop in Fayetteville and the history of [Mr. Crudup]." The letter identifies other "victims," and explains what Mr. Donovan's continuing efforts will involve. Finally, the letter explains that Mr. Donovan tried to settle with Mr. Crudup, and that

> He also could have (and still can) avoided bankruptcy. I am the largest plaintiff and already have an offer on the table to settle for $17,500. A simple loan away if he really does not have the money (I am not convinced until his deposition and discovery phase of the bankruptcy). The 2nd largest plaintiff (Pat Carden) has expressed to me he would buy Chris' debt for pennies on the dollar. Both cases are probably very easily solved (and bankruptcy avoided) if Chris would step up to the plate, be a man, and take ownership of his crimes. The other minor debts are nothing and not worth what he is about to go through as I contest this.... In another two years he will again regret not settling with me now so that he (and you his shop partner) can move on with their life.

Mr. Crudup contends that this letter is an effort to collect the debt owed to Mr. Donovan. He also notes that the letter is part of a course of harassment that began prior to Mr. Crudup's bankruptcy filing. Mr. Donovan, on the other hand, testified that he was not trying to collect the debt, but instead wanted to inform Mrs. Crudup that she had gone into business with a person who had defrauded numerous "victims." He also explained that he understood that Mr. Crudup had painted him in a bad light, and he wanted Mr. Crudup's family to understand that he was not a bad person, but a victim who wanted to set things right and protect others. Mr. Donovan also contends that the letter is an exercise of his First Amendment right to free speech, and that if the court finds that it violates 11 U.S.C. § 362, then the automatic stay violates the First Amendment. Mr. Donovan also contends that any effort to limit his use of discovery obtained in the bankruptcy proceeding would also violate the First Amendment.

■ The court finds that the letter is clearly an attempt to collect the debt owed to Mr. Donovan. While it may contain factual information in an effort to educate

Mrs. Crudup, it also provides threats of future acts and a way to make Mr. Donovan cease his efforts, that is, to pay him the $17,500 that he last offered to accept. Mr. Donovan testified that the letter was not intended as an effort to collect the debt, but the court found his explanation to be unpersuasive, and the clear language of the letter contradicts the testimony regarding intent.

█ Because the court finds that the letter violates § 362, it must consider Mr. Donovan's contention that such a finding infringes upon his First Amendment rights to free speech. Mr. Donovan relies on *Turner Advertising Co. v. National Service Corp. (In re National Service Corp.)*, 742 F.2d 859 (5th Cir.1984), and *Tantilla v. Stonegate Security Services, Ltd. (In re Stonegate Security Services, Ltd.)*, 56 B.R. 1014 (N.D.Ill.1986), to support his contention that the letter constitutes protected speech.

In *National Service Corp.*, the Fifth Circuit Court of Appeals held that an advertising company could not be enjoined from posting billboards reading, "Beware, This Company Is In Bankruptcy" and "Beware, This Company Does Not Pay Its Bills," finding that the message "simply states two unassailable facts, that [the debtor] is in bankruptcy and that [the debtor] cannot pay its bills." 742 F.2d at 862. The court found that the only threat to the debtor posed by the message "was that the consumers in the Atlanta area would become familiar with [the debtor's] bankruptcy," which would not warrant the use of a prior restraint of free speech. *Id.* The court did not discuss whether the intent of the message was to collect a debt in violation of § 362, nor did it discuss the governmental interest advanced by § 362.

Similarly, *Stonegate Security* involved a creditor who parked a truck outside the debtor's business premises that had the words "Stonegate Auto Alarms does not pay supplier"; "Stonegate Auto Alarms does *not* pay suppliers"; and "Crime does not pay, Stonegate Auto Alarms the same way" painted on the front, side and rear of the truck. After acknowledging that § 362 could constitutionally curtail "harassing" speech under certain circumstances, the court held that "the language used did not present a clear and present danger of frustrating the reorganization in any degree and was therefore deserving of First Amendment protection." 56 B.R. at 1020. The court criticized the bankruptcy court for finding that the action of parking the truck constituted harassment for the purpose of collecting the debt without hearing any evidence on this point, and further noted that because this creditor filed the involuntary petition against the debtor, "it is not self-evident that it wanted to impede the bankruptcy proceeding." *Id.* at 1020 n. 3.

Neither case cited by Mr. Donovan explores the purpose behind § 362, nor does either case address conduct that is clearly directed toward debt collection. The United States District Court for the Northern District of Illinois, which decided *Stonegate Security,* had another opportunity to consider the interplay between § 362 and the First Amendment in *In re Andrus,* 189 B.R. 413 (N.D.Ill.1995). In *Andrus,* the creditor engaged in a pattern of harassing conduct after the debtors' discharge was granted, including posting signs near the debtors' house, leaving messages on the debtors' answering machine threatening to ruin their reputation in the community unless the debt was repaid, approaching the debtors, and shouting at them. The bankruptcy court found that the creditor violated the discharge injunction by engaging in a course of conduct intended to force the payment of a discharged debt, and ordered the creditor to pay remedial and

compensatory damages as well as to remove the sign. The creditor contended that the discharge injunction and the contempt finding abridged his First Amendment right to free speech.

The district court observed that the discharge injunction and the contempt order "were directed at conduct—that is, attempting to collect a discharged debt. The fact that [the] conduct contained a 'communicative element' does not necessarily render it protected speech under the First Amendment." 189 B.R. at 416 (citations omitted). Where speech and non-speech elements are involved, the constitutionality of an injunction is evaluated under the test outlined in *United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968). *Id.*

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1678. The *Andrus* court noted that Congress has the power to create uniform bankruptcy laws and to provide for their enforcement under Article I, Section 8 of the United States Constitution. "Proper enforcement of the Bankruptcy Code would be seriously undermined if courts could not enjoin efforts at collecting discharged debts and punish those who ignored court orders." 189 B.R. at 416. The court further found that the discharge injunction was directed only at conduct intended to frustrate the discharge order and was not related to suppression of free expression. *Id.* Finally, the restriction on speech "was no great-

er than necessary to prevent [the creditor's] pattern of harassment and coercion." *Id.*

The *Andrus* court further found that even if the injunction was directed at pure speech, as opposed to speech and conduct, the First Amendment was not violated. The court noted that two significant governmental interests were implicated by the conduct of the creditor: "the power of the courts to enforce and protect their judicial process, and the ability of the Bankruptcy Code to protect debtors." *Id.* at 417. The court found that the contempt order was narrowly tailored to address these two concerns, and that no future speech was impeded.

Similarly, the United States Bankruptcy Court for the Eastern District of Pennsylvania concluded that there is no overlap between conduct prescribed by § 362(a)(6) and that which is protected by the First Amendment. *Sechuan City, Inc. v. North American Motor Inns, Inc. (In re Sechuan City, Inc.)*, 96 B.R. 37, 42 (Bankr. E.D.Pa.1989). The court noted the dual nature of the automatic stay: to protect debtors from "all collection efforts, all harassment, and all foreclosure actions," and to protect creditors by preventing some creditors from obtaining "payment of the claims in preference to and to the detriment of other creditors ...." 96 B.R. at 40 (citing H.R.Rep. No., 95–595, 95th Cong. 1st Sess. 340 (1977), U.S. Cong. & Admin. News 1978, p. 5787). The court concluded that while § 362 is broad, it "is sufficiently tailored to leave unfettered speech which will not affect the twin purposes behind the automatic stay." 96 B.R. at 44. In that case, the actions of the creditor "were designed to place the debtor in a position of either paying the lessor's prepetition claim or losing business due to defendants' actions. Such a choice

runs counter to the purpose of § 362(a)." *Id.* at 41–42.

As noted above, the court finds that Mr. Donovan's letter was an attempt to collect the debt owed by Mr. Crudup. He admits that he has engaged in and will continue to engage in a pattern of conduct designed to prevent Mr. Crudup from operating a business. The letter clearly states that his efforts will cease if Mr. Crudup pays him the $17,500 he last offered to accept. This letter violates both purposes behind the automatic stay: it harasses and threatens the debtor, and it seeks to put Mr. Donovan ahead of other creditors in the distribution of assets. The court agrees with the analysis in *Andrus* and *Sechuan City,* and finds that the limited speech curtailed by the automatic stay is not protected by the First Amendment. Unlike in the cases cited by Mr. Donovan, his speech and conduct go beyond informing the public of Mr. Crudup's bankruptcy filing, and indeed go beyond the alleged "public service" of trying to prevent others from becoming "victims" of Mr. Crudup.

Having concluded that Mr. Donovan violated § 362(a)(6), the court must consider appropriate sanctions under § 362(h). Mr. Crudup has not presented evidence of actual damages caused by the letter, though he indicated in his motion that his relationship with his wife's parents has been damaged. In considering the nature of the stay violation, as well as Mr. Crudup's motion for a protective order that is based on concerns that Mr. Donovan will continue to disseminate information obtained through discovery in the bankruptcy proceeding, the court concludes that an appropriate sanction is to deny Mr. Donovan the ability to conduct a Rule 2004 examination of Mr. Crudup, as well as any document production attendant thereto. It is apparent that Mr. Donovan possesses ample information to enable him to participate fully in the bankruptcy proceeding, and he will not suffer any greater harm by not taking the 2004 examination than is sufficient to sanction him for the stay violation.

Based on the foregoing, the debtor's motion for sanctions is **ALLOWED**; the debtor's motion for a protective order is **ALLOWED** by virtue of the sanction awarded, and Mr. Donovan's motion to compel and for sanctions is **DENIED** as a result of the sanction imposed. Mr. Donovan is reminded that the automatic stay continues in effect, and that further sanctions may be awarded if future actions are taken that violate the stay.

**SO ORDERED.**